TIMOTHY COURCHAINE
United States Attorney
District of Arizona

PATRICK E. CHAPMAN
Arizona State Bar No. 025407
Assistant United States Attorney
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: Patrick.Chapman@usdoj.gov
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-24-01741-PHX-DJH |
|---|---|
| Plaintiff, | |
| vs. | **UNITED STATES' SENTENCING MEMORANDUM** |
| Gerardo Loya, | |
| Defendant. | |

The United States requests that this Court sentence the defendant to 121 months' imprisonment, followed by supervised release. Such a sentence is sufficient, but not greater than necessary to comply with the purposes of sentencing and factors set forth in 18 U.S.C. § 3553(a).

**I.    FACTS**

In May 2024, an FBI confidential informant sent Gerardo Loya the phone number for an ATF Undercover Agent (UC) for the purpose of trafficking in firearms and narcotics. In March and April 2024, Loya had sold firearms and machinegun conversion devices (MCDs) to the confidential informant as part of a state investigation. In one transaction, Loya identified himself as "Gerardo" and used a phone number ending in 8115. FBI researched the number and found the user to be Gerardo Loya with an address in Guadalupe, Maricopa County, Arizona. Loya's MVD photograph also matched the suspect in the transactions. Within a day of the confidential informant sending the UC's phone

number, Loya began texting the UC about firearms and drugs. The transactions are detailed below.

On May 23, 2024, Loya messaged the UC about selling methamphetamine and two AR-15 firearms. The two agreed to a total price of $3,100 and scheduled the transaction for later that day at Arizona Mills Mall.  Loya told the UC he was driving a dark gray Jeep. At the agreed upon time, Loya arrived in a dark gray Jeep SUV, pulled up near the UC, and entered the UC's vehicle (UCV).  Loya confirmed with the UC that he was there for the transaction. Loya was carrying a guitar bag at the time.

Upon entering the UCV, the UC opened the guitar bag and found two brand new Plum Crazy AR-15s.  Loya told the UC that his contact for the methamphetamine never responded.  The parties then negotiated a price for the two firearms and agreed to $1,600. Prior to departing, Loya and the UC discussed machinegun conversion devices and firearms trafficking. The SUV was found to be registered to Martha Loya, Gerardo's mother.

On May 29, 2024, FBI special agents contacted the ATF UC about Loya offering to sell a "pineapple," which the UC understood to be a grenade. The UC subsequently contacted Loya and asked about the grenade, and Loya confirmed he had one left.  Loya then sent multiple photos of firearms he claimed to have available for purchase.  Loya asked $500 for the grenade and $2,900 for the three firearms. The UC also asked for two pounds of methamphetamine as previously discussed with Loya.  The two scheduled the transaction the following day at an agreed upon location

At the given time and location, Loya arrived in his gray Jeep.  Loya exited the Jeep and retrieved a guitar case as before.  Loya took three firearms out of the guitar bag and placed them on a table.  The firearms were one Glock 19, one privately-made firearm, and one Romarm AK-47.  Loya told the UC that the AK was new.  When the UC told Loya that he didn't care whether the firearms were "hot" because they were going out-of-state, Loya advised the Glock was hot.  The UC then paid Loya $2,900 for the three firearms.

Another ATF UC was present for the transaction and posed as a buyer of

methamphetamine.  Loya introduced himself to the second UC as "Gerardo."  The two continued to discuss methamphetamine prices.

Loya and the first ATF UC then discussed the grenade, which Loya produced from a green pouch. Loya instructed the UC that the grenade had a five second lead time and to be careful about removing the pin.  Loya stated that some of his homies had recently used one in Tucson, and it worked. The UCs then paid Loya $500 for the grenade.

Prior to leaving, Loya told the UCs that his associates were planning to burglarize a gun dealer and he would be selling the firearms for half off.  Loya also mentioned that he liked the current transaction location because his associates had recently been arrested at Arizona Mills Mall and lost $10,000. An ATF explosives expert later determined the grenade to be inert, as it had no fuse or energetic filler.

Pursuant to previous discussions, on June 4, 2024, the UC messaged Loya about purchasing methamphetamine, referring to it as "waters."  Loya agreed and the two scheduled the transaction for the next day.  On June 5, 2024, Loya again arrived at the given location in his Jeep and was carrying a grocery bag.  Loya opened the bag on a table and removed two clear plastic bags containing suspected methamphetamine.  The UCs (there were two for this transaction) weighed the bags and paid Loya $1,800 for the drugs.

Before leaving, Loya and the UCs discussed fentanyl prices and Loya said it was easier to get than methamphetamine.  The UCs asked about the FFL burglary and Loya said the target was Scheels Sporting Goods in Chandler and they were hoping to steal at least ten firearms.  Loya then said one of his associates was sentenced to ten years in prison for robbing a Chuck E. Cheese restaurant.

The methamphetamine was sent to the DEA lab and was identified as methamphetamine hydrochloride, 889.1 grams, and 100% purity $\pm$ 7%.

On June 11, 2024, the UC messaged Loya asking to buy "boats," which is slang for 1,000 fentanyl pills.  This was previously discussed in the June 5th transaction.  Loya responded, "You needed 5 right?"  The UC agreed and confirmed he wanted five boats and asked if the price was still 37 cents per pill.  Loya responded saying the price was 40 cents

and the two scheduled the transaction for the next day.  Later the same day, Loya sent the UC a photograph of two Taurus pistols asking if the UC wanted them.

On June 12th, Loya arrived at the agreed upon location with a second male. The two exited Loya's Jeep and Loya placed a camouflage backpack on the warehouse table and removed two firearms from it.  Loya advised the firearms were clean and the UC paid him $1,000 for them.  Loya next removed five plastic bags containing blue pills from a fanny pack.  The UCs weighed the pills and paid Loya $2,000.  Loya advised they were premium quality.

The group next discussed cocaine prices, robbing Scheels, and the viability of selling fentanyl in the northeast United States.  At one point, the first UC noticed a firearm on Loya's waistband and asked him what type of firearm he carried.  Loya stated he always carried a Glock for personal protection and lifted his shirt showing the UCs his firearm.

The DEA lab tested the blue pills and found them to contain 535.8 grams of fentanyl at 2.1% purity.

On June 17, 2024, Loya sent the UC a picture of a Smith & Wesson pistol with three magazines. The UC responded the next day and the two discussed prices. On June 24, 2024, Loya texted the UC again offering a different Smith & Wesson firearm for $650.  He also asked if the other UC was still looking for boats.  The UC replied that they did not need boats at the moment and scheduled the firearm transaction for later that day.

Loya and another male – the same as before – arrived at the given location in a silver PT Cruiser.  Loya exited and produced two firearms that he claimed were brand new.  The parties agreed to $1,200 for both guns. The UC then asked Loya about stolen cars, as Loya has previously offered several stolen vehicles. Loya generally talked about what vehicles he had available.  He also discussed how his group switched registrations of the stolen vehicles by using junkyard cars.

Between June 29th and July 2nd, Loya sent the UC pictures of three firearms, asking $1,300 for all three.  He also sent photos of other firearms including a shotgun and mentioned stolen vehicles again.  The two eventually scheduled a transaction for July 2nd.

On that date, Loya arrived in his gray Jeep with the same friend as before. Loya produced five firearms and placed them on a table in the ATF warehouse. While discussing the firearms, the UC noticed that Loya had suspected cocaine and fentanyl in the same bag that the firearms were in, and asked to buy an ounce of cocaine. Loya agreed and sold five firearms and an ounce of cocaine for $2,800.

Loya and his friend both commented that the cocaine was high quality, and the group discussed a later transaction for a kilogram. They further discussed pricing and different quality cocaine.

The group then talked about hunting and fishing and the UC asked what type of firearm Loya's associate used to protect himself while outdoors. He replied that he had a Glock currently but was looking to buy an FN Five-seveN. The UC asked if there were bears where he went and he replied, "Hell yeah." The UC responded that he better bring Loya with him because of Loya's 10mm Glock that he kept on him. At this, Loya corrected the UC and said he had a .357 Glock, not a 10mm. He lifted up his shirt again to show a Glock in a holster on his waistband. The UC said that a .357 would do the job just fine. The group finally discussed stolen vehicles and fentanyl before departing.

The DEA lab tested the cocaine and found it to weigh 29.1 grams at 85% purity. The firearms purchased were one Beretta M9, one Taurus M380 Ultralite Revolver, one Ruger Security-9, one Glock 19, and one Sarsilmax SAR9.

On August 23, 2024, the UC messaged Loya asking if Loya could hook him up with straps and boats. Loya agreed, the two discussed prices, and set the transaction for August 29, 2024. On August 29th, Loya asked the UC if he wanted "snow," meaning cocaine. The UC asked for an ounce and Loya said he would start driving to the UC. Loya also offered methamphetamine, but the UC said he did not need any.

A short time later, Loya advised he would be in a white Rav4 SUV. Loya arrived at the location and produced one Sig Sauer P365 pistol, suspected fentanyl, and cocaine. Loya and the UC agreed to $2,700 for the items. Two other unidentified males were with Loya at the time.

Before departing, Loya discussed Glock switches and some sort of pill that improves sexual performance with the UC, called "Tusi." The DEA lab tested the suspected fentanyl and found it to contain Lidocaine and not fentanyl. The suspected cocaine was found to weigh 28.7 grams.

Following indictment, the defendant was arrested on October 22, 2024. On September 8, 2025, Loya pleaded guilty to Distribution of Five Grams or More of Methamphetamine, for the June 5, 2024 transaction.

## II.    PRESENTENCE REPORT GUIDELINES CALCULATION

The United States agrees with the Presentence Report's (PSR) guidelines calculation of Total Offense Level 33, Criminal History Category I, and 135 – 168 months' imprisonment, following adjustments for possession of a firearm and acceptance of responsibility. (PSR at ¶ 21, 27 – 28.) The PSR recommends a sentence of 121 months' imprisonment. (*Id*. at p. 17.)

## III.    SENTENCING RECOMMENDATION

The United States agrees with the PSR and recommends that this Court sentence the defendant to 121 months' imprisonment following a slight variance. This recommendation is supported by the nature and circumstances of the offenses, the history and characteristics of the defendant, and the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

First, the nature and circumstances of the defendant's conduct support the requested sentence. In multiple undercover transactions, the defendant sold three rifles, 12 pistols, an inert grenade, cocaine, and significant quantities of fentanyl and methamphetamine. (*Id*. at ¶ 15.) During at least two of the transactions, the defendant was armed with a firearm. The pending state matter involves much of the same conduct, with the defendant selling firearms and MCDs to a confidential informant in March and April 2024. Prior to those transactions, the defendant communicated with incarcerated and influential Arizona Mexican Mafia members and appeared to discuss firearm and MCD trafficking. Notably, one influential Mexican Mafia member the defendant was communicating with and the confidential informant he sold to in the state case were from the same town as the

defendant. The Mexican Mafia member was later murdered in state prison and Phoenix Police shot and killed the informant.

The conduct and the players involved show that this was not aberrant criminal behavior. Rather, it was the result of trust and relationships built over time, and the defendant was a willing participant. Because the seriousness of introducing the sold items into the community, a sentence of 121 months' imprisonment is recommended, even for this first-time offender.

The defendant presents with no criminal history, which is noteworthy given his obvious criminal associations. That said, he does not appear to have significant mitigation either. The Presentence Report indicates a cancer diagnosis for his mother and that his teenage sister suffers from Down syndrome. (*Id*. at ¶ 39.) He also dropped out of school at a young age because he struggled academically and felt compelled to help his family. (*Id*. at ¶ 50.) The defendant did not report abuse in the home and does not appear to have suffered other adverse childhood experiences. (*Id*. at ¶ 39 – 42.) Although the sentencing guidelines contemplate first-time offenders like the defendant, given the significant guideline range and the defendant's possible motivations, a variance below the range is warranted. Accordingly, the defendant's history and characteristics support the government's recommended sentence.

Finally, the recommended sentence generally accords with similarly situated defendants and avoids unwarranted sentencing disparities. According to the United States Sentencing Commission's Judiciary Sentencing Information, from 2020 to 2024, there were 710 defendants sentenced under USSG § 2D1.1 for Methamphetamine (actual) with a Total Offense Level of 33 in Criminal History Category I. (*See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard.) Of those 710, 706 were sentenced to prison for an average length of 101 months and median length of 108 months. (*Id*.) Thus, the recommended sentence generally accords with similarly situated offenders, especially considering the totality of the defendant's conduct.

## IV.   CONCLUSION

The defendant sold firearms, significant quantities of drugs, and a purported grenade to undercover agents over three months in 2024. Prior to that, in conjunction with prison gang members, the defendant sold firearms and MCDs to a confidential informant. The law prescribes significant penalties for trafficking such items, undoubtedly due to the danger they pose to the public. The case for a significant penalty is even stronger when the trafficking is done with organized criminal organizations and prison gangs. For the portion of the defendant's conduct that was captured by law enforcement, a sentence of 121 months is appropriate. Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the defendant's offenses and deter others from engaging in the same conduct.

Respectfully submitted this 26th day of November, 2025.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*/s/ Patrick E. Chapman*
PATRICK E. CHAPMAN
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on the foregoing date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrant:

Ian Bucon, *Attorney for Defendant*

*/s/ Patrick E. Chapman*
U.S. Attorney's Office